# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FREELINC TECHNOLOGIES, INC., *et al.*, | § | Case No. 18-11254 (__) |
| | § | |
| | § | |
| DEBTORS.[1] | § | (Joint Administration Pending) |
| | § | |

-----------------------------------------------------x

## FIRST DAY EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING CERTAIN RELATED RELIEF

FreeLinc Technologies, Inc. ("FreeLinc Inc.") and FreeLinc Technologies, LLC ("FreeLinc LLC") (collectively, the "Debtors"), through their proposed counsel, hereby move pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an interim order, substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") (i) authorizing the Debtors to obtain post-petition financing, (ii) scheduling a final hearing, and (iii) granting related relief.  In support of this motion, the Debtors rely on the *Declaration of Michael Abrams in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"),[2] and state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FreeLinc Technologies, Inc. (8250); and FreeLinc Technologies, LLC (4199).  The location of the Debtors' service address is 266 Washington Street, Sherborn, MA 01771.

[2] Capitalized terms not herein defined shall have the meanings ascribed to them in the First Day Declaration or the DIP Term Sheet (as defined herein).

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363 and 364 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2. The Debtors confirm their consent, pursuant to Rule 7008 of the Bankruptcy Rules and Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## GENERAL BACKGROUND

3.    On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under title 11 of the Bankruptcy Code (the "Bankruptcy Case").  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no party has requested the appointment of a trustee or examiner in these Chapter 11 cases, and no committee has been appointed under section 1102 of the Bankruptcy Code.

4.    This Court has jurisdiction over these Chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is properly in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

## Business Operations of FreeLinc Inc.

6.    FreeLinc Inc. is a research and development company focused on the application and adoption of Near Field Magnetic Induction ("NFMI") as a new Wireless Personal Area Networking ("WPAN") standard for public safety, military, healthcare, consumer electronics, and IoT markets.[3] NFMI offers powerful new capabilities to existing WPAN technology, and provides superior security, reliability, power-efficiency, and multipoint connectivity. FreeLinc Inc. holds over 40 patents and operates primarily as a technology licensor. It partners with industry leaders to develop products and applications to meet the needs of secure and reliable WPAN connections. Ensuring that its customers receive high quality products and WPAN connections is of the utmost importance for FreeLinc Inc.'s business operations.

7.    FreeLinc Inc. is a Delaware corporation with headquarters located at 266 Washington Street, Sherborn, Massachusetts 01770. FreeLinc Inc.'s primary operations are located at 829 S 220 E, Orem, Utah 84057.

8.    FreeLinc Inc. has six (6) employees at this time. Four (4) of the employees are full-time salaried, and two (2) are hourly employees. FreeLinc LLC has no employees.

9.    As of the Petition Date, FreeLinc Inc. is owned by several shareholders. FreeLinc LLC is the majority shareholder of FreeLinc Inc. FreeLinc LLC was formed in November of 2013. FreeLinc Inc. was formed in April of 2014.

10.    The Debtors' primary assets are intellectual property and patents.

## The Debtors' Equity Security Holders

---

[3] The current standard is Bluetooth technology; however, the Debtors have established in the marketplace that the NFMI technology is superior in quality and security to Bluetooth technology.

11.     In the three years prior to the Petition Date, FreeLinc Inc. averaged approximately $200,000 per year in annual revenue.  FreeLinc Inc. projects that during its first 12 months of operations after exiting bankruptcy, its earnings before interest, taxes and amortization will be approximately $562,380.00.  The following year's projection is $4,945,700.00.  Each subsequent year will also show substantial increases in revenue. These projections by FreeLinc Inc. are based on capturing a conservative section of a very large market of WPAN devices and technology.  Furthermore, the United States Special Operations Command ("SOCOM") has already committed $2.35 million toward non-recurring engineering costs to research, design, develop, and test new products or for product enhancement.[4]

12.     In order to fund the research and development of NFMI, the Debtors entered into Note Purchase Agreements (the "Notes") with 49 total lenders (the "Lenders")[5] from the years 2013 through 2017 for a total amount of $12,531,854.00 including interest accrued as of March 31, 2018.

13.     Both FreeLinc Inc. and FreeLinc LLC have entered into Notes with the Lenders.  As consideration for the amounts loaned by the Lenders under the Notes, each Note would have a principal balance equal to the amount loaned and substantially all of the Notes are convertible into "conversion shares" of FreeLinc Inc.  As of this filing, the Debtors are in default on many of these Notes or they have matured on their terms.

14.     Some of the Notes include terms which purport to grant security interests in the Debtors' assets.  However, as of the Petition Date, none of the security interests were perfected or recorded in any way.

---

[4] Details regarding this new project are confidential at this time.
[5] Some of the Lenders hold multiple Notes.

15.     As of the Petition Date, there are approximately 200 equity holders in FreeLinc Inc., who have invested money in return for shares of the corporation.

16.     The Debtors also have outstanding operating debts totaling approximately $1.3 million.

17.     The Debtors are current on their taxes and insurance.

**Events Leading to the Chapter 11 Bankruptcy**

18.     The Debtors are currently operating and have several customers to whom they sell their NFMI products. The Debtors no longer have the capital to continue operations and to continue payments to Lenders.  This could result in their inability to pay the Lenders if the Lenders seek to enforce the terms of the Notes.  As of the date of this Motion, no Lender has enforced its remedies under the Notes.

19.     As described below, the Debtors have obtained a commitment for debtor-in-possession financing. Upon initiating the Chapter 11 proceedings, FreeLinc Inc. would be provided with $600,000 to continue operating, licensing, and selling its NFMI technology.  FreeLinc Inc. has also negotiated a commitment for exit financing from the Chapter 11 proceedings pending the confirmation of a plan of reorganization and the successful restructuring of FreeLinc Inc.'s operations, as well as Court approval of the financing.

20.     If the Debtors are unable to initiate chapter 11 proceedings, then the Debtors believe that they will be unable to continue operations. If the Debtors are unable to continue operations, the Lenders could initiate proceedings to collect on the defaulted Notes, which could ultimately result in a forced sale of their assets at a depressed value for stakeholders. The Debtors believe that their inability to continue operations, and a sale of their assets, is not in the best interest of their creditors or Lenders.

21.     The Debtors seek to initiate the Bankruptcy Case in order to seek protection under the Bankruptcy Code while FreeLinc Inc. continues its operations.  The Debtors believe that continuing operations of FreeLinc Inc. in the Bankruptcy Case and obtaining debtor-in-possession financing will allow them to ultimately reorganize their business operations to become profitable and continue their research and development endeavors.

**RELIEF REQUESTED**

22.     Through this Motion, the Debtors request that the Court enter the Order, substantially in the form as attached hereto as **Exhibit 1** (the "Interim Order"), seeking the following relief:

a.     Authorizing the Debtors to obtain to obtain a priming secured, post-petition super priority financing (the "DIP Facility") pursuant to the terms and conditions of the certain commitment and related terms and conditions, dated as of May 24, 2018, by and between the Debtors and Richard Propper ("Mr. Propper"),  Thomas S. Bridges Revocable Trust, (the "Bridges Trust"), Reid Scott Holbrook ("Mr. Holbrook"), Dr. Michael Abrams ("Dr. Abrams"), Mark Wankel ("Mr. Wankel"), and SHKH LLC ("SHKH") (collectively, the "DIP Lender"), attached hereto as **Exhibit 2** (the "DIP Term Sheet"), and all agreements, documents, instruments and certificates executed, delivered, filed or entered into in connection with the DIP Facility and DIP Term Sheet (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, collectively, the "DIP Loan Documents"), providing for, *inter alia*, a new money secured loan in the total amount of $600,000, (the "DIP Loan").  Mr. Propper, Thomas S. Bridges and Dr. Abrams are directors of FreeLinc Inc.  Dr. Abrams is also the managing member of

FreeLinc LLC. Mr. Holbrook is a principal at the investment banking firm, Mountain Summit Advisors, hired by the Debtors pre-petition to solicit capital. SHKH's principal, Stephen Hochschuler, and Mr. Wankel are equity owners and noteholders of the Debtors.

b. Authorizing the Debtors to execute, enter into, and deliver to the DIP Lender all documentation for the DIP Facility and any associated security documents in form and substance satisfactory to the DIP Lender and to perform such other and further acts as may be required in furtherance of the DIP Facility and the DIP Loan Documents;

c. Authorizing the Debtors to use the proceeds of the DIP Loan to pay for the costs related to continued operation of the Debtors' business operations, the costs of administration of the Chapter 11 cases and such other costs as expressly agreed to by the DIP Lender, in accordance with the DIP Loan Documents and the Budget (as defined below);

d. There are no parties entitled to adequate protection.

e. Granting the DIP Lender automatically perfected priming first-priority security interests in, and liens on, all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder (collectively, the "DIP Obligations") which liens and security interests shall be subject only to Permitted Liens (defined below) and the Carve-Out (defined below);

f. Granting allowed super priority administrative expense claims to the DIP Lender for the DIP Obligations;

g.  Modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim and Final Orders, as applicable;

h.  Scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2, to consider entry of the Final Order, *inter alia¸* approving and authorizing the DIP Facility (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis.

## **BASIS FOR RELIEF**

23.     As noted above, if the Debtors do not receive the DIP Facility then they will not be able to continue their business operations. The Debtors have an immediate and critical need to obtain post-petition financing in order to pursue their reorganization efforts.  If the Debtors are unable to continue operations, the Lenders could initiate proceedings to collect on both of the Debtors' defaulted Notes, which would likely result in a forced sale of assets at a depressed value. This is not in the best interest of the Debtors' creditors.

24.     The Debtors are unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority claim pursuant to section 364(a)(1) of the Bankruptcy Code, without the grant of liens on assets.

25.     The Debtors have been unable to obtain funding on terms that are more favorable than offered by the DIP Lender.

26.     The DIP Lender has indicated a willingness to provide the Debtors with certain financing, but only in compliance with the terms and conditions set forth in the Interim Order and the Final Order.   The Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender represents the best financing presently available to the Debtor.   These funds will be used to continue the Debtors' business operations, licensing, and selling their NFMI technology.   The DIP Facility would also cover the costs of administration of these Chapter 11 cases, to pay such other costs expressly agreed to by the DIP Lender in accordance with the DIP Loan, and otherwise fund the expenses of the business.

27.     The Debtors have negotiated the DIP Facility in good faith with the DIP Lender. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

## SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITY

28.     The following is a summary of the terms of the DIP Facility:

| | |
|---|---|
| Type and Amount: | The DIP Financing will be in the total amount of $600,000 (the "Maximum Commitment") and, upon entry of the Interim Order an amount not to exceed $300,000 pending entry of a further order of the Court (the "Final Order"), that shall be available to borrow in accordance with the terms and conditions identified in the DIP Term Sheet (the "DIP Loan"). |
| Purpose: | The proceeds of the DIP Facility shall be used in accordance with an agreed budget (the "Budget") as between the Debtors and the DIP Lender upon entry of the Interim Order by the Bankruptcy Court.  Funds advanced pursuant to the DIP Facility shall be used to fund operations of the Debtors, costs of the administration of the Debtors bankruptcy cases, and for all purposes set forth in the Budget. |
| Budget: | The Debtors and the DIP Lender have agreed to the Budget attached as **Exhibit 3**. |
| Reporting: | The Debtors shall report to the DIP Lender regarding their performance compared to the Budget on a weekly basis or as agreeable to the parties. |

| | |
|---|---|
| <u>Priority</u>: | As set forth in the DIP Term Sheet, the DIP Loan shall be: |

1. Pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in these Chapter 11 cases with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates, whether heretofore or hereafter incurred, of the kinds specified in sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, payable from all assets of the Debtors' estates including, subject to entry of a the Final Order, the proceeds of avoidance actions;

2. Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first-priority security interest in and lien on the DIP Collateral (as defined below) to the extent that such DIP Collateral (as defined below) is not subject to valid, perfected and non-avoidable liens as of the Petition Date;

3. Pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first-priority security interest in and lien on all DIP Collateral including, to the extent such DIP Collateral is subject to prior, perfected liens, such liens shall be primed by the liens granted to the DIP Lender (the "Priming DIP Lien"); and

4. The Priming DIP Lien shall not be subject to being treated *pari passu* with or subordinated to any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions to be expressly agreed upon in writing by the DIP Lender in its discretion or imposed by applicable non-bankruptcy law (collectively, the "Permitted Liens").

| | |
|---|---|
| <u>Security</u>: | As set forth in the DIP Term Sheet, the DIP Loan shall be secured by, among other things, a first-priority lien on the DIP Collateral, subject to (a) valid, enforceable and perfected security interests and liens existing as of the date hereof (the "Pre-existing Liens"), and (b) the Carve-Out (as defined below). The Debtors represent that as of the date hereof, there are no Pre-existing Liens. |
| <u>Perfection</u>: | The DIP Liens shall be perfected by operation of the entry of the Interim Order and Final Order effective as of the Petition Date, without the need of the DIP Lender to file or record any statement, notice or other document or instrument to provide notice of or to further perfect any such interest or lien. |

| | |
|---|---|
| DIP Collateral: | "DIP Collateral" means, collectively, all of the assets (tangible, intangible, real, personal or mixed) of the Debtors, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries (only up to 66% in foreign subsidiaries), investment property, instruments, chattel paper, real estate, proceeds from the sale or other disposition of any leasehold interests (but not the leaseholds themselves), contracts, patents, copyrights, trademarks, causes of action (excluding Avoidance Actions and proceeds thereof, provided, however, upon entry of a Final Order, any superpriority administrative claim shall be entitled to receive payment from and have recourse to the proceeds from any Avoidance Actions), and other general intangibles, and all products and proceeds thereof. |
| Interest: | The outstanding principal amount of the DIP Facility shall bear interest at the rate of 1.75% per month.   Interest will accrue on a monthly basis and the Debtors shall pay the principal and interest for a minimum of six months on the Maturity Date (defined below).  As additional consideration, the Debtors shall exercise their best efforts to provide warrants to the DIP Lender on terms acceptable to the parties to a Plan of Reorganization. |
| Maturity Date: | The DIP Facility shall be due and payable on the earlier of (i) a Final Order confirming a Chapter 11 Plan of Reorganization; (ii) entry of an order converting the Debtors' Chapter 11 cases to Chapter 7 cases; (iii) occurrence of an Event of Default not cured within five (5) days; or (iv) the six-month anniversary of the funding of the DIP Facility. |
| Optional Prepayments: | The Debtors may prepay the DIP Loan in whole or in part before maturity, however, a minimum of six months interest will be due to the DIP Lender regardless of repayment date. |
| Conditions Precedent: | The DIP Facility is conditioned on the following: (1) Entry of an Interim Order and (2) Execution of the DIP Term Sheet. |
| Carve-Out: | Any and all liens, security interests and claims of the DIP Lender to be granted or provided for pursuant to the terms hereof**,** shall be subject and subordinate to a carve-out (the "Carve-Out") for (a) the payment of all allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the Debtors from the Filing Date until the occurrence and continuation of an Event of Default (as defined herein) (the "Pre-Default Carve-Out") and until receipt by the Debtors, their counsel, and the United States Trustee of a written notice from DIP Lender identifying such Event of Default and terminating the Pre-Default Carve-Out (a "Carve-Out Notice"); (b) the payment of allowed professional fees and disbursements incurred by professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the Debtors, in an aggregate amount not to exceed $120,000.00 (the "Post-Default |

Carve-Out") for services rendered after receipt by the Debtors, their counsel, and the United States Trustee of a Carve-Out Notice; provided that any payments actually made to such professionals for services rendered following the occurrence and continuation of an Event of Default and after receipt by the Debtors, their counsel, and the United States Trustee of a Carve-Out Notice, shall reduce the Post-Default Carve-Out on a dollar-for-dollar basis; and (c) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) plus interest at the statutory rate and any fees payable to the Clerk of the Bankruptcy Court. So long as an Event of Default shall not have occurred and be continuing and no Carve-Out Notice shall have been given, the Debtors shall, to the extent provided in the Budget, be permitted to pay fees, compensation and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under Bankruptcy Code §§ 330, 331 and/or 503, as the same may be due and payable, and the same shall be applied to the Pre-Default Carve-Out but shall not reduce the Post-Default Carve-Out.

Adequate
Protection
Payments:                Adequate protection payments are not required.

Right to
Credit Bid:              Pursuant to section 363(k) of the Bankruptcy Code, to the extent the Debtors pursue a sale of their assets during the course of these Chapter 11 cases, the DIP Lender is entitled to credit bid the full amount of the outstanding DIP Obligations.

## APPLICABLE AUTHORITY

**A.     The Debtors Should be Permitted to Obtain Post-Petition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.**

29.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

(d)(1) authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
       (A) the [debtor] is unable to obtain credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

30.    In evaluating proposed post-petition financing under sections 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.  unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.  the credit transactions are necessary to preserve assets of the estate;

c.  the terms of the credit agreement are fair, reasonable, and adequate;

d.  the proposed financing agreement was negotiated in good faith and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e.  the proposed financing agreement adequately protects prepetition secured creditors.

*See e.g. In re Aqua Assoc.*, 132 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.,* 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

31.    For the reasons discussed below, the Debtors satisfy the standards required to access post-petition financing on a secured superpriority and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**B.    The Debtors were Unable to Obtain Financing on More Favorable Terms.**

32.     The Debtors solicited alternative financing proposals prior to the Petition Date. However, the Debtors were unable to procure unsecured financing.  The current proposal was on the terms that were most beneficial to the estate.  The Debtors believe their efforts to obtain post-petition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.  *See e.g. In re Los Angeles Dodges LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("The Court 'may not approve any credit  transaction under subsection (c) [of Section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b).'"); *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

33.     Additionally, given the severity of the repercussions if the Debtors do not obtain financing - the value of the Debtors' business will continue to diminish and they will not be able to cover their operating expenses, including payroll - the Debtors do not have an unlimited amount of time to find more favorable terms.  *See e.g. In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code "imposes no duty to seek credit from every possible lender, particularly when time is of the essence to preserve a vulnerable seasonal enterprise").

**C.     The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates.**

34.     As the debtor-in-possession, the Debtors have a fiduciary duty to protect and maximize the assets of their estates.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The DIP Facility allows the Debtors to satisfy such obligation.  As noted *supra*, the Debtors need financing and were forced into these Chapter 11 cases as a result their depleting capital and lending resources.   Without the agreement of the DIP Lender to provide the Debtors with financing, the Debtors would be forced to cease business operations.  This would certainly cause immediate harm to the Debtors, the Lenders, and the Debtors' creditors, as well as to those companies and entities that are in the process of entering into licensing agreements and purchasing the Debtors' products.

**D.      The Terms of the DIP Facility are Fair, Reasonable and Appropriate Given the Circumstances.**

35.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *See also In re Ellingsen MacLean Oil Co.*, 65 B.R. 385, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

36.     The DIP Facility was negotiated in good faith between the Debtors and the DIP Lender.  These negotiations resulted in an agreement which will allow the Debtors to continue their operations and successfully reorganize.

**E.      Entry into the DIP Facility Reflects the Debtors' Sound Business Judgment.**

37.     A debtor's decision to enter into a post-petition financing arrangement under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See e.g. In re Los Angeles Dodgers LLC*, 457 B.R. at 313; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr.

S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

38.    Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13. (Bankr. D. Utah 1981).  The court will generally not second-guess a debtor-in-possession's business decisions involving a "business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14.

39.    As noted above, the Debtors have exercised sound business judgment in determining that the DIP Facility does satisfy the legal prerequisites to incur debt under section 364 of the Bankruptcy Code.   As definitively set forth in the DIP Term Sheet and DIP Loan Documents, the Debtors believe the DIP Facility provides the best terms that are available under the circumstances.

40.    The DIP Loan is essential to enable the Debtors to avoid irreparable harm to the Debtors' business operations, assets, the Lenders and their creditors.

41.    Therefore, pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Debtors respectfully submits that they should be granted authority to enter the DIP Facility and obtain the DIP Loan on the secured and administrative superpriority basis described herein.

**F.    Interim Approval of the DIP Loan Should be Granted.**

42.    It is essential that the Debtors immediately receive financing to continue their business operations and stabilize cash flow, which will permit the Debtors to formalize a plan to reorganize and continue their business operations.   Therefore, the Debtors are seeking interim approval to access the funds under the DIP Loan to meet their working capital needs, including

purchasing inventory, paying FreeLinc Inc.'s employees and continuing negotiations with SOCOM.

43.     The Debtors submit that this Court should grant the Debtors' request for immediate authority to use the DIP Facility to prevent immediate and irreparable harm to the Debtors' estates and stakeholders pending a final hearing on the motion pursuant to Bankruptcy Rule 4001(c).  The ability of the Debtors to finance their operations and the availability of sufficient capital through the DIP Facility is vital to the preservation of the Debtors' estates and business.  The Debtors, therefore, seek authority to obtain DIP Facility.

44.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

45.     In examining requests for interim relief under this rule, courts apply the same business judgment standard to other business decisions. *See e.g. Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449.  Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.

46.     The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the approval of the DIP Facility.

## **REQUEST FOR A FINAL HEARING**

47.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, in no event later than

fourteen days following the entry of the Interim Order, and fix the time and date prior to the Final

Hearing for parties to file objections to the motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

48.     To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the

use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

49.     The Debtors will provide notice of this Motion to: (a) the Office of the United States

Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the

Debtors; (c) counsel to the DIP Lender; (d) any party that has requested notice pursuant to

Bankruptcy Rule 2002; and (e) any such other party entitled to notice pursuant to Rule 9013-1(m)

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware.  As this Motion is seeking "first day" relief, within two business days

of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered

in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light

of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

50.     No prior request for the relief sought in this Motion has been made to this Court or

any other Court.

## CONCLUSION

WHEREFORE, the Debtors request that this Court enter an Interim Order substantially in

the form attached hereto as **Exhibit 1** and grant such other and further relief as the Court may

deem proper.

Dated: May 24, 2018
      Wilmington, Delaware

Respectfully submitted by:

**ASHBY & GEDDES, P.A.**

*/s/ William P. Bowden*
William P. Bowden (No. 2553)
Gregory A. Taylor (No. 4008)
Katharina Earle (No. 6348)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899-1150
Phone: 302.654.1888
Fax: 302.654.2067
Email: wbowden@ashbygeddes.com
      gtaylor@ashbygeddes.com
      kearle@ashbygeddes.com

-and-

**THE DRAGICH LAW FIRM PLLC**
David G. Dragich (pro hac vice pending)
Amanda C. Vintevoghel (pro hac vice pending)
17000 Kercheval Avenue, Suite 210
Grosse Pointe, MI 48230
Tel: 313.886.4550
Fax: 313.221.9612
Email: ddragich@dragichlaw.com
      avintevoghel@dragichlaw.com

*Proposed Attorneys for Debtors and Debtors-in-Possession*

**<u>EXHIBIT 1</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------x
```
| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FREELINC TECHNOLOGIES, INC., *et al.*, | § | Case No. 18-11254 (__) |
| | § | |
| | § | |
| DEBTORS.[1] | § | (Joint Administration Pending) |
| | § | |
```
-----------------------------------------------------x
```

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN
POST-PETITION FINANCING, (II) SCHEDULING A FINAL
HEARING, AND (III) GRANTING RELATED RELIEF**

This matter coming before the Court on the Debtor's *First Date Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Scheduling a Final Hearing, and (III) Granting Certain Related Relief* (the "**Motion**"),[2] filed by the above-captioned debtors and debtors-in-possession (FreeLinc Technologies, Inc. and with FreeLinc Technologies, LLC, collectively, the "**Debtors**") seeking, pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the District of Delaware (the "**Local Rules**"), the entry of interim and final orders, which, among other things:

    (i)    authorize the Debtors to obtain a priming secured, post-petition super priority financing (the "**DIP Facility**") pursuant to the terms and conditions of this Interim Order and that

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FreeLinc Technologies, Inc. (8250); and FreeLinc Technologies, LLC (4199).  The location of the Debtors' service address is 266 Washington Street, Sherborn, MA 01771.

[2] Capitalized terms not otherwise defined in this Interim Order shall have the meanings given to them in the Motion or the DIP Term Sheet, as applicable.

certain commitment and related terms and conditions, dated as of May 23, 2018, by and between the Debtors and Richard Propper ("Mr. Propper"),  Thomas S. Bridges Revocable Trust, (the "Bridges Trust"), Reid Scott Holbrook ("Mr. Holbrook"), Dr. Michael Abrams ("Dr. Abrams"), Mark Wankel ("Mr. Wankel"), and SHKH LLC ("SHKH") (collectively, the "**DIP Lender**"), attached to the Motion as <u>Exhibit 2</u> (the "**DIP Term Sheet**"), and all agreements, documents, instruments and certificates executed, delivered, filed or entered into in connection with the DIP Facility and DIP Term Sheet (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, collectively, the "**DIP Loan Documents**"), providing for, *inter alia*, a new money secured loan in the total amount of $600,000.00 (the "**DIP Loan**");

(ii)    authorize the Debtors to execute, enter into and deliver to the DIP Lender all documentation for the DIP Facility and any associated security documents in form and substance satisfactory to the DIP Lender and to perform such other and further acts as may be required in furtherance of the DIP Facility and the DIP Loan Documents;

(iii)    authorize the Debtors to use the proceeds of the DIP Loan to pay for the costs related to the Debtor's business operations, the costs of administration of the Chapter 11 case and such other costs as expressly agreed to by the DIP Lender, in accordance with the DIP Loan Documents and the budget (the "**Budget**", a copy of which is attached to the Motion as <u>Exhibit 3</u>, with such term including  any subsequent Budget approved by the DIP Lender after entry of this Interim Order);

(iv)    grant the DIP Lender automatically perfected priming first-priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder (collectively, the "**DIP Obligations**"), subject only to (a) any permitted liens, and to any valid, perfected, unavoidable liens or security interests in existence as of the Petition Date ("Pre-existing Liens"), or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (b) the Carve-Out (as defined below).

(v)    modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vi)    schedule a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to consider entry of a final order (the "**Final Order**") authorizing the DIP Loan and granting any requested relief not granted under any interim order on a final basis, all as set forth in the Motion;

and the Court having considered the Motion, the *Declaration of Michael Abrams in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the exhibits attached to the Motion, and any evidence submitted at the Interim Hearing held before this Court; and due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having

been given in accordance with Bankruptcy Rules 2002, 4001 and 9014; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and the relief requested being fair and reasonable and in the best interests of the Debtors, their estates, the Lenders, their creditors, and essential for the Debtors' reorganization efforts and the continued operation of the Debtor's business through the period covered by the current Approved Budget (or any subsequent Approved Budget); and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or to obtain credit secured solely by the Debtors' unencumbered assets or by junior liens on previously-encumbered assets; and upon the record before the Court with respect to the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

Based upon the record established at the interim hearing, IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      <u>Financing Approved</u>.  The Motion is granted as set forth herein in accordance with the terms of this Interim Order.  On an interim basis, in order to avoid immediate and irreparable harm to the Debtors' estates, the Debtors are authorized to immediately obtain the funds from the DIP Loan in the amount of $300,000 from the DIP Lender pursuant to the terms and conditions set forth in the executed DIP Loan Documents and this Interim Order.  All objections to the Motion, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.  The rights of all parties in interest to object to the entry of a Final Order are reserved.

2.      Jurisdiction.  This Court has core jurisdiction over these Chapter 11 cases, the Motion, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      Notice. The notice given by the Debtors of the Motion, the Interim Hearing, and the proposed Interim Order constitutes appropriate, due and sufficient notice thereof and complies with the Bankruptcy Rules and Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.      Findings Regarding the DIP Financing.

(a)      *Cause*.  Good cause has been shown for entry of this Interim Order.

(b)      *Need for DIP Financing.*  Without the financing proposed by the Motion, the Debtors will not be able to continue their business operations, nor pursue reorganization efforts. The access of the Debtors to the DIP Financing is vital for preserving and maximizing the value of the Debtors' estates for the benefit of their Lenders and creditors.  Failure to obtain the relief requested in the Motion and as provided in this Interim Order will result in immediate and irreparable harm to the Debtors, their estates, and creditors.

(c)      *No Credit Available on More Favorable Terms.*  The Debtors are unable to obtain financing on terms more favorable than those offered by the DIP Lender under the DIP Financing. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those offered by the DIP Lender under the DIP Financing.  The Debtors have made an adequate showing of their efforts to obtain financing on more favorable terms for the purposes of the relief granted herein.  A credit facility in the amount and on the terms provided by the DIP

Facility is not available from the DIP Lender without the Debtors granting to the DIP Lender (i) the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein), and (ii) the other protections set forth in this Interim Order.

(d)     *Business Judgment and Good Faith Pursuant to Section 364(e).*  The terms and conditions of the DIP Facility and the DIP Loan Documents are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated without collusion, in good faith and at arms' length between the Debtors and the DIP Lender.  Use of credit to be extended under the DIP Facility  shall be deemed to have been so allowed, advanced, made, used or extended in good faith, within the meaning of section 364(e) of the Bankruptcy Code and in express reliance on the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the full protections and benefits of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(e)     *Interim Relief.*  Absent the relief provided by this Interim Order, the Debtors, their estates, and their creditors will be harmed.

5.     <u>Authorization of the DIP Facility and DIP Facility Terms</u>.  The Debtors are expressly and immediately authorized to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents.

6.     <u>Interest Rate</u>. The Debtors are authorized to incur interest on the DIP Facility at a rate of 1.75% per month as set forth in the DIP Loan Documents.  Interest will accrue on a monthly basis and the Debtors shall pay the principal and interest for a minimum of six months on the

Maturity Date (defined below).  As additional consideration, the Debtors shall exercise their best efforts to provide warrants to the DIP Lender on terms acceptable to the parties to a Plan of Reorganization.

7.      DIP Lender Fees and Expenses.  The Debtors are required to reimburse the DIP Lender for all reasonable costs and expense, including legal fees in connection with the negotiation, documentation and delivery of the DIP Facility, not to exceed $7,500.00 (collectively, the "**DIP Lender Expenses**").

8.      Purpose of the DIP Financing.  From and after the Petition Date, the Debtors shall use the funds from the DIP Facility only for the purposes specifically set forth in this Interim Order and the other DIP Loan Documents, and in compliance with the Budget.

9.      Superpriority Claims.     Pursuant to Sections 364(c)(1), (c)(2) and (d) of the Bankruptcy Code, all amounts owing by the Debtors pursuant to the DIP Facility at all times will constitute allowed superprority administrative claims (the "**DIP Superpriority Claims**") with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates in these Chapter 11 cases and, as detailed below, will be secured by all assets of the Debtors, whether existing as of the Petition Date or thereafter acquired (excluding avoidance actions under Chapter 5 of the Bankruptcy Code ("Avoidance Actions") and proceeds thereof, provided however, upon entry of a Final Order, any DIP Superpriority Claim shall be entitled to receive payment from and have recourse to the proceeds from any Avoidance Action, subject only to (a) valid, enforceable and perfected security interests and liens existing as of the Petition Date, if any, and (b) the Carve-Out (as defined below).

10.     Security.  As detailed herein, all amounts and other obligations owing by the Debtors under the DIP Facility in respect thereof at all times will be secured by all of the assets

(tangible, intangible, real, personal or mixed) of the Debtors, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries (only up to 66% in foreign subsidiaries), investment property, instruments, chattel paper, real estate, proceeds from the sale or other disposition of any leasehold interests (but not the leaseholds themselves), contracts, patents, copyrights, trademarks, causes of action (excluding Avoidance Actions and proceeds thereof, provided, however, upon entry of a Final Order, any DIP Superpriority Claim shall be entitled to receive payment from and have recourse to the proceeds from any Avoidance Actions), and other general intangibles, and all products and proceeds thereof (collectively, "**DIP Collateral**").  The liens on the DIP Collateral shall constitute: (i) under Section 364(c)(2) of the Bankruptcy Code, valid, enforceable and perfected first priority security interests and liens in favor of the DIP Lender in all unencumbered assets of the Debtors and (ii) under Section 364(d) of the Bankruptcy Code, valid, enforceable and perfected first priority, priming security interest and lien in favor of the DIP Lender with priority over any lien asserted by any other party (the security interests and liens described in clauses (i) and (ii) the "**DIP Liens**"); and (iii) all obligations under the DIP Facility shall constitute DIP Superpriority Claims with priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expense claims in the Chapter 11 Cases and payable from the proceeds of all property of the Debtors' property and the proceeds thereof, including, without limitation, upon entry of a Final Order, proceeds of Avoidance Actions.  The DIP Liens and DIP Superpriority Claims shall be subject only to: (i) Pre-existing Liens, if any, and (ii) the Carve-Out (as defined below).  The DIP Liens granted to the DIP Lender pursuant to the Interim Order and the Final Order, to secure the obligations under the DIP Facility shall not be subordinated to, or made *pari passu* with, any other lien or security interest under Section 364(d) of the Bankruptcy Code, and shall not be subject or subordinate to

any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Section 551 of the Bankruptcy Code; rather the provisions of Section 551 of the Bankruptcy Code shall not apply and any such avoided lien shall be deemed to have not existed as of the Petition Date with the DIP Liens in favor of the DIP Lender attaching to such DIP Collateral with priority over or in the stead of such avoided liens.

11.    Perfection of DIP Liens.  The DIP Liens shall be perfected by operation of the entry of the Interim Order and Final Order effective as of the Petition Date, without the need of the DIP Lender to file or record any statement, notice or other document or instrument to provide notice of or to further perfect any such interest or lien.

12.    Carve-Out; Payment of Retained Professionals.  Any and all liens, security interests and claims of the DIP Lender to be granted or provided for pursuant to the terms hereof**,** shall be subject and subordinate to a carve-out (the "**Carve-Out**") for (a) the payment of all allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code Sections 327 or 1103(a), by the Debtors from the Petition Date until the occurrence and continuation of an Event of Default (as defined herein) (the "**Pre-Default Carve-Out**") and until receipt by the Debtors, their counsel, and the United States Trustee of a written notice from DIP Lender identifying such Event of Default and terminating the Pre-Default Carve-Out (a "**Carve-Out Notice**"); (b) the payment of allowed professional fees and disbursements incurred by professionals retained, pursuant to Sections 327 or 1103(a) of the Bankruptcy Code, by the Debtors in an aggregate amount not to exceed $120,000.00 (the "**Post-Default Carve-Out**") for services rendered after receipt by the Debtors, their counsel, and the United States Trustee of a Carve-Out Notice; provided that any payments actually made to such professionals for services rendered following the occurrence and continuation of an Event of Default and after receipt by the Debtors,

their counsel, and the United States Trustee of a Carve-Out Notice, shall reduce the Post-Default Carve-Out on a dollar-for-dollar basis; and (c) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) (as determined by agreement of the United States Trustee or by final order of the Court), together with the statutory rate of interest, and any fees payable to the Clerk of the Bankruptcy Court.  So long as an Event of Default shall not have occurred and be continuing and no Carve-Out Notice shall have been given, the Debtors shall, to the extent provided in the Budget, be permitted to pay fees, compensation and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under Sections  330, 331 and/or 503 of the Bankruptcy Code, as the same may be due and payable, and the same shall be applied to the Pre-Default Carve-Out but shall not reduce the Post-Default Carve-Out.

13.    <u>Reporting</u>.  The Debtors shall report to the DIP Lender regarding their performance compared to the Budget on a weekly basis or as agreeable to the parties.

14.    <u>Events of Default</u>.  The occurrence of any of the following shall constitute an "**Event of Default**" under the Interim Order or a Final Order approving the DIP Facility:

(a)    Failure to make payments when due hereunder or under the Interim Order or Final Order.

(b)    Any material breach of any representation or warranty hereunder.

(c)    Failure of the Bankruptcy Court to enter the Final Order by June 30, 2018.

(d)    Dismissal of any material portion of the Chapter 11 Cases with respect to any of the Debtors or conversion of any of such case to a Chapter 7 case.

(e)    Appointment of a Chapter 11 trustee or examiner or other person with expanded powers.

(f)     The granting of relief from the automatic stay to any third party to permit foreclosure on material assets of the Debtors.

(g)     Reversal, vacation or stay of the effectiveness of any of the Interim Order or the Final Order.

(h)     Any order entered transferring venue of the Chapter 11 Cases or any of them.

(i)     Cessation of DIP Liens or DIP Superpriority Claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority status required herein.

(j)     Failure by the Debtors to perform or comply in any material respect with any term, condition, covenant or obligation contained herein, on their part to be performed or complied with where any such failure to perform or comply is not remedied within five (5) business days following written notice of the default.

(k)     Except as set forth herein, the entry of any order of the Bankruptcy Court granting a superpriority claim or lien *pari passu* with or senior to that granted to the DIP Lenders hereunder.

(l)     The Debtors becomes unable or admits in writing its inability or fails generally to pay its post-petition debts as they become due, or any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such person and is not released, vacated or fully bonded within thirty days after its issue or levy.

15.     <u>Remedies</u>.  Subject to the Debtors' ability to cure within five (5) days following written notice, if any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions:

(a)     declare the commitment of DIP Lender to make DIP Loans to be terminated, whereupon such commitments shall be terminated;

(b)     declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other DIP Loan Documents to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; and

(c)     exercise all rights and remedies available to it and the Lenders hereunder.

16.     <u>Right to Credit Bid; Distribution of Proceeds</u>.

(a)     In the event of a sale during these Chapter 11 cases, the rights of the DIP Lender to credit bid (whether under section 363(k) of the Bankruptcy Code or otherwise), to the extent of the full amount of the outstanding DIP Obligations, shall not be impaired.  For the avoidance of doubt, the DIP Lender shall have the unfettered right to credit bid.

(b)     The DIP Lender shall be entitled to exercise or submit its credit bid at any time prior to the conclusion of any auction contemplated in any bidding procedures proposed in these Chapter 11 cases.  The DIP Obligations and the DIP Liens shall, for the avoidance of doubt, be deemed to exist and to be valid, properly perfected, unavoidable and not subject to subordination, dispute, voidance, avoidance or other challenge for purposes of submitting such a credit bid and obtaining a distribution of the proceeds of any such sale.

17.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>. The terms and conditions of the DIP Loan and the DIP Loan Documents are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated without collusion, in good faith between the Debtors and the DIP Lender.

18.    <u>Challenge Period</u>.  Subject only to the terms of this paragraph 18, the terms set forth in this Interim Order shall be without prejudice to the rights of any Committee or party in interest with appropriate standing to seek to disallow any alleged secured prepetition claim, pursue any claims or seek appropriate remedies against any alleged secured prepetition secured party or avoid all or substantially all of any prepetition security interests or liens on the Debtors' assets, including any claim, action, or proceeding brought against any alleged secured prepetition party that requires such party to disgorge any adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order as a result of any prepetition secured parties' claims against the Debtors or any liens upon and security interests in the assets and properties of Debtors being invalidated, avoided, subordinated, impaired, or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement.  Any party (other than the Debtors, which have waived all such rights), including any Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of any prepetition secured party, including in the nature of a setoff, counterclaim, or defense on or before (i) with respect to any Committee, the earlier of (a) sixty (60) calendar days from the date the U.S. Trustee appoints such Committee or (b) seventy-five (75) calendar days following

the entry of the Interim Order, or (ii) with respect to all other parties, seventy-five (75) calendar days following the entry of the Interim Order (the "Challenge Period").   Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge; (i) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred.  Nothing in this Interim Order vests or confers on any person, including any Committee or any other statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.  For the avoidance of doubt, entry of this Interim Order shall not grant standing or authority to any Committee to pursue any cause of action, claim, defense, or other right on behalf of the Debtors or their estates.

19.    <u>Modification of Automatic Stay</u>. The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtors and DIP Lender to take any action necessary to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents.

20.    <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, subject to the Final Order, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 cases, or upon dismissal of the Bankruptcy Case.

21.    <u>Amendments</u>.  The Debtors and the DIP Lender may enter into amendments or modifications of the DIP Loan Documents or the Approved Budget without further notice and

hearing or order of this Court.  The Debtors and the DIP Lender shall provide notice to counsel to any official committee and the Office of the United States Trustee of any modifications or amendments that do not materially and adversely affect the rights of any creditor or other party-in-interest.  Any proposed modification or amendment that would materially and adversely affect the rights of any creditor or other party-in-interest shall be filed on the Court's docket and any official committee, the U.S. Trustee and other parties-in-interest shall have three (3) days from the date of filing of such material modification or amendment to object in writing to such amendment and, if no objections are received, such modification or amendment shall be deemed effective.  If an objection is received, then the modification or amendment shall be subject to further order of this Court.

22.    <u>Bankruptcy Rule 7052</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

23.    <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

24.    <u>Final Hearing</u>.  The Final Hearing shall be held on June __, 2018 at __:__ _.m. Objections to entry of the Final Order shall be filed and served, so as to be received by counsel to the Debtor, counsel to any official committee, the DIP Lender, and the United States Trustee on or before June __, 2018 at __:__ _.m.

_____
United States Bankruptcy Judge

**<u>EXHIBIT 2</u>**

## DEBTOR IN POSSESSION TERM SHEET

## FOR FREELINC TECHNOLOGIES, INC. AND FREELINC TECHNOLOGIES, LLC

**DIP Lender**: Richard Propper ("Mr. Propper"), Thomas S. Bridges Revocable Trust (the "Bridges Trust), Reid Scott Holbrook ("Mr. Holbrook), Dr. Michael Abrams ("Dr. Abrams"), Mark Wankel ("Mr. Wankel"), and SHKH LLC ("SHKH") (collectively, the "DIP Lender"). The DIP Lender reserves the right to syndicate or assign the DIP Facility to a lender or group of lenders. Each DIP Lender has committed to the following amounts:

- Mr. Propper ($100,000)
- Bridges Trust ($75,000)
- Mr. Holbrook ($125,000)
- Dr. Abrams ($150,000)
- Mr. Wankel ($100,000)
- SHKH ($50,000)

**Borrowers/Debtors**: Freelinc Technologies, Inc. and Freelinc Technologies, LLC as borrowers (each a "Debtor" and collectively, the "Debtors")

**Bankruptcy Filing:** The Debtors anticipate filing voluntary bankruptcy cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to Chapter 11 of the Bankruptcy Code. Upon commencement of the bankruptcy cases, the Debtors will file a motion to approve the DIP Facility, on an interim and final basis, in accordance with Section 364 of the Bankruptcy Code, which motion and orders shall be in forms acceptable to the DIP Lender.

**DIP Facility**: Subject to, *inter alia,* agreement on the Budget (as defined and discussed below), a priming secured, super-priority debtor-in-possession credit facility, pursuant to the terms of this Term Sheet with a maximum aggregate principal amount (the "Commitment Amount") of up to $600,000 (collectively, the "DIP Facility"). All draws outstanding under the DIP Facility (the "Loans") shall become due and payable as set forth herein. Following the entry of the Interim DIP Order, defined below, and prior to the entry by the Bankruptcy Court of an order finally and unconditionally approving the DIP Facility on terms and conditions satisfactory to the DIP Lenders (the "Final Order"), the maximum aggregate principal amount of the DIP Facility shall be limited to $600,000, unless otherwise agreed to by the Debtors and the DIP Lender.

**Use of Funds; Purpose:** The proceeds of the DIP Facility shall be used in accordance with an agreed budget (the "Budget") as between the Debtors and the DIP Lender upon entry of the Interim DIP Order by the Bankruptcy Court. Funds advanced pursuant to the DIP Facility shall be used to fund operations of the Debtors, costs of the administration of the Debtors bankruptcy cases, and for all purposes set forth in the Budget.

**Maturity Date:** The DIP Facility shall be due and payable on the earlier of (i) a Final Order confirming a Chapter 11 Plan of Reorganization; (ii) entry of an order converting the Debtors'

1

Chapter 11 cases to Chapter 7 cases; (iii) occurrence of an Event of Default not cured within five (5) days; or (iv) the six-month anniversary of the funding of the DIP Facility.

**Priority:** As more fully set forth in the Interim DIP Order and Final Order all amounts owing by the Borrowers under the DIP Facility in respect thereof at all times will constitute allowed superpriority administrative claims and allowed senior secured claims, pursuant to Bankruptcy Code §§364(c)(1), (c)(2) and (d) secured by all assets of the Borrowers, whether existing as of the Petition Date or thereafter acquired (excluding avoidance actions under Chapter 5 of the Bankruptcy Code ("Avoidance Actions") and proceeds thereof, provided, however, upon entry of a Final Order, any superpriority administrative claim shall be entitled to receive payment from and have recourse to the proceeds from any Avoidance Actions), subject only to (a) valid, enforceable and perfected security interests and liens existing as of the date hereof (the "Pre-existing Liens"), and (b) the Carve-Out (as defined below). The Debtors represent that as of the date hereof, there are no Pre-existing Liens.

**Security:** As more fully set forth in the Interim DIP Order and Final Order all amounts and other obligations owing by the Borrowers under the DIP Facility in respect thereof at all times will be secured by all of the assets (tangible, intangible, real, personal or mixed) of the Borrowers, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries (only up to 66% in foreign subsidiaries), investment property, instruments, chattel paper, real estate, proceeds from the sale or other disposition of any leasehold interests (but not the leaseholds themselves), contracts, patents, copyrights, trademarks, causes of action (excluding Avoidance Actions and proceeds thereof, provided, however, upon entry of a Final Order, any superpriority administrative claim shall be entitled to receive payment from and have recourse to the proceeds from any Avoidance Actions), and other general intangibles, and all products and proceeds thereof (collectively, "DIP Collateral"). The liens on the DIP Collateral shall constitute: (i) under section 364(c)(2) of the Bankruptcy Code, valid, enforceable and perfected first priority security interests and liens in favor of the DIP Lender in all unencumbered assets of the Borrowers and (ii) under section 364(d) of the Bankruptcy Code, valid, enforceable and perfected first priority, priming security interest and lien in favor of the DIP Lender with priority over any lien asserted by any other party (the security interests and liens described in clauses (i) and (ii) the "DIP Liens"); and (iii) all obligations under the DIP Facility shall constitute allowed administrative expense claims with priority under section 364(c)(1) of the Bankruptcy Code (the "Super-priority Claim") over all other administrative expense claims in the Chapter 11 Cases and payable from the proceeds of all property of the Borrowers' property and the proceeds thereof, including, without limitation, upon entry of a Final Order, proceeds of Avoidance Actions. The DIP Liens and Super-Priority Claim shall be subject only to Pre-existing Liens and the Carve-Out. The DIP Liens granted to the DIP Lender pursuant to the Interim DIP Order and the Final Order, to secure the obligations under the DIP Facility shall not be subordinated to, or made *pari passu* with, any other lien or security interest under section 364(d) of the Bankruptcy Code, and shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of Borrowers' estates under § 551 of the Bankruptcy Code; rather the provisions of §551 of the Bankruptcy Code shall not apply and any such avoided lien shall be deemed to have

2

not existed as of the Petition Date with the DIP Liens in favor of the DIP Lender attaching to such Collateral with priority over or in the stead of such avoided liens.

**Perfection:**  The DIP Liens shall be perfected by operation of the entry of the Interim DIP Order and Final Order effective as of the Petition Date, without the need of the DIP Lender to file or record any statement, notice or other document or instrument to provide notice of or to further perfect any such interest or lien.

**Interest Rate:**  The outstanding principal amount of the DIP Facility shall bear interest at the rate of 1.75% per month.  Interest will accrue on a monthly basis and the Debtors shall pay the principal and interest for a minimum of six months on the Maturity Date (defined below).  As additional consideration, the Debtors shall exercise their best efforts to provide warrants to the DIP Lender on terms acceptable to the parties pursuant to a Plan of Reorganization.

**Carve-Out:**  Any and all liens, security interests and claims of the DIP Lender to be granted or provided for pursuant to the terms hereof, shall be subject and subordinate to a carve-out (the "Carve-Out") for (a) the payment of all allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by Borrowers from the Filing Date until the occurrence and continuation of an Event of Default (as defined herein) (the "Pre-Default Carve-Out") and until receipt by Borrowers, their counsel, and the United States Trustee of a written notice from DIP Lender identifying such Event of Default and terminating the Pre-Default Carve-Out (a "Carve-Out Notice"); (b) the payment of allowed professional fees and disbursements incurred by professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by Borrowers, in an aggregate amount not to exceed $120,000 (the "Post-Default Carve-Out") for services rendered after receipt by Borrowers, their counsel, and the United States Trustee of a Carve-Out Notice; provided that any payments actually made to such professionals for services rendered following the occurrence and continuation of an Event of Default and after receipt by Borrowers, their counsel, and the United States Trustee of a Carve-Out Notice, shall reduce the Post-Default Carve-Out on a dollar-for-dollar basis; and (c) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) plus interest at the statutory rate and any fees payable to the Clerk of the Bankruptcy Court.  So long as an Event of Default shall not have occurred and be continuing and no Carve-Out Notice shall have been given, Borrowers shall, to the extent provided in the Budget, be permitted to pay fees, compensation and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under Bankruptcy Code §§ 330, 331 and/or 503, as the same may be due and payable, and the same shall be applied to the Pre-Default Carve-Out but shall not reduce the Post-Default Carve-Out.

**Reporting**:  The Debtors shall report to the DIP Lender regarding their performance compared to the Budget on a weekly basis or as agreeable to the parties.

**Conditions Precedent:** (1) Entry of the Interim DIP Order; and (2) Execution of this Term Sheet.

**Events of Default:**  The occurrence of any of the following shall constitute an Event of Default under this Term Sheet and the Interim DIP Order or a Final DIP Order approving the DIP Facility):

3

(a)      Failure to make payments when due hereunder or under the Interim DIP Order or Final Order.

(b)      Any material breach of any representation or warranty hereunder.

(c)      Failure of the Bankruptcy Court to enter the Final Order by June 30, 2018.

(d)      Dismissal of any material portion of the Chapter 11 Cases with respect to any of the Borrowers or conversion of any of such case to a Chapter 7 case.

(e)      Appointment of a Chapter 11 trustee or examiner or other person with expanded powers.

(f)      The granting of relief from the automatic stay to any third party to permit foreclosure on material assets of the Borrowers.

(g)      Reversal, vacation or stay of the effectiveness of any of the Interim DIP Order or the Final Order.

(h)      Any order entered transferring venue of the Chapter 11 Cases or any of them.

(i)      Cessation of DIP Liens or Super-Priority Claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority status required herein.

(j)      Failure by the Borrowers to perform or comply in any material respect with any term, condition, covenant or obligation contained herein, on their part to be performed or complied with where any such failure to perform or comply is not remedied within five (5) days following written notice of the default.

(k)      Except as set forth herein, the entry of any order of the Bankruptcy Court granting a superpriority claim or lien *pari passu* with or senior to that granted to the DIP Lenders hereunder.

(l)      Any Borrower becomes unable or admits in writing its inability or fails generally to pay its post-petition debts as they become due, or any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty days after its issue or levy.

**Remedies:** Subject to the Debtors' ability to cure within five (5) days following written notice of a default, if any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions:

(a)      declare the commitment of DIP Lender to make Term Loans to be terminated, whereupon such commitments shall be terminated;

(b)      declare the unpaid principal amount of all outstanding Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)      exercise all rights and remedies available to it and the Lenders hereunder.

4

**Representations:**  The Debtors hereby represent and warrant that (a) all information (other than the Projections) made available to the DIP Lender in connection with the DIP Facility (the "Information"), as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the financial projections and other forward-looking information (the "Projections") that have been or are hereafter made available to the DIP Lender by the Debtors or their representatives in connection with the DIP Facility, as and when furnished, have been or will be prepared in good faith based upon assumptions believed by you to be reasonable. The Debtors agree to furnish the DIP Lender with supplements to the Information and/or the Projections from time to time until the date of the initial borrowing under the DIP Facility. The Debtors understand that in issuing this Term Sheet, the DIP Lender is and will be using and relying on the Information and Projections without independent verification thereof.

**Indemnification:**  The Debtors agree to indemnify and hold harmless the DIP Lender, in its capacity as such, its affiliates and their respective partners, members, directors, agents, attorneys, employees, officers, advisors, trustees, other representatives or controlling persons (collectively, "Indemnified Persons") from and against, any and all losses, claims, damages, liabilities and reasonable out-of-pocket legal and other expenses of any kind, joint or several, to which such Indemnified Person may become subject or that may be incurred or asserted or awarded against such Indemnified Person, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation, claim or proceeding) the DIP Facility. The Debtors also agree that none of the Indemnified Persons will have any liability to the Debtors or any person asserting claims on behalf of or in right of the Debtors in connection with or as a result of this arrangement.

**Non-Assignable:**  This Term Sheet shall not be assignable by the Debtors and is intended to be solely for the benefit of the parties hereto and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.  This Term Sheet may not be amended or waived except by an instrument in writing signed by the Debtors and the DIP Lender.

**DIP Lender Expenses:**  The Debtors shall reimburse the DIP Lender for all reasonable costs and expenses, including legal fees, in connection with the negotiation, documentation and delivery of the DIP Facility, not to exceed $7,500.00.

**Plan of Reorganization/Exit Financing:**  The Debtors intend to file a Plan of Reorganization on or before July 15, 2018.  The Debtors have obtained a commitment from another lender whereby that lender will provide working capital funding upon the Debtors' confirmation of a Plan of Reorganization (the "Exit Financing") in the approximate amount of $5,750,000 which includes full payment of the DIP Facility.

**Counterparts:**  This Term Sheet may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.

**Entire Agreement:**  This Term Sheet embodies the entire agreement and understanding among the Debtors and the DIP Lender with respect to the DIP Facility and supersedes all prior agreements and understandings relating to the specific matters contemplated herein.  No party has been authorized by us to make any oral or written statements that are inconsistent with this Term Sheet.

*[Remainder of Page Intentionally Left Blank]*

**DIP LENDER**

**RICHARD PROPPER**

By: _____

Name: _____

Dated: _____

**THOMAS S. BRIDGES REVOCABLE TRUST**

By: _____

Name: _____

Dated: _____

**REID SCOTT HOLBROOK**

By: _____

Name: _____

Dated: _____

**DR. MICHAEL ABRAMS**

By: *Michael S. Abrams*
0CA829325B4445D

Name: Michael S. Abrams _____

Dated: 5/24/2018 6:49:40 AM PDT _____

**SHKH LLC**

By: _____

Name: _____

Dated: _____

**MARK WANKEL**

By: _____

Name: _____

Dated: _____

7

**DIP LENDER**

**RICHARD PROPPER**                         **THOMAS S. BRIDGES REVOCABLE TRUST**

By: _____             By: _____

Name: _____          Name: _____

Dated: _____         Dated: _____


**REID SCOTT HOLBROOK**                      **DR. MICHAEL ABRAMS**

By: _____             By: _____

Name: _____          Name: _____

Dated: _____         Dated: _____


**SHKH LLC**                                  **MARK WANKEL**

By: _____             By: *Mark Wankel*
                                         DocuSigned by:
                                         5CC7EC386C7F448...

Name: _____          Name: Mark Wankel

Dated: _____         Dated: 5/24/2018 6:51:33 AM MST


7

**DIP LENDER**

**RICHARD PROPPER**                          **THOMAS S. BRIDGES REVOCABLE TRUST**

By: _____            By: _____

Name: _____            Name: _____

Dated: _____            Dated: _____

**REID SCOTT HOLBROOK**                      **DR. MICHAEL ABRAMS**

By: *Scott Holbrook*                         By: _____
DocuSigned by:
7EF0B2603373407

Name: Scott Holbrook                        Name: _____

Dated: 5/24/2018 6:59:32 AM PDT             Dated: _____

**SHKH LLC**                                 **MARK WANKEL**

By: _____            By: _____

Name: _____            Name: _____

Dated: _____            Dated: _____

7

**<u>DIP LENDER</u>**

**RICHARD PROPPER**                    **THOMAS S. BRIDGES REVOCABLE TRUST**

By: _____          By: _____
                                      AAAE493136BE444

Name: _____          Name: Thomas Bridges
                                      _____

Dated: _____          Dated: 5/24/2018 7:18:01 AM MST
                                      _____

**REID SCOTT HOLBROOK**                **DR. MICHAEL ABRAMS**

By: _____          By: _____

Name: _____          Name: _____

Dated: _____          Dated: _____

**SHKH LLC**                           **MARK WANKEL**

By: _____          By: _____

Name: _____          Name: _____

Dated: _____          Dated: _____

**DIP LENDER**

**RICHARD PROPPER**

By: _____

Name: _____

Dated: _____

**THOMAS S. BRIDGES REVOCABLE TRUST**

By: _____

Name: _____

Dated: _____

**REID SCOTT HOLBROOK**

By: _____

Name: _____

Dated: _____

**DR. MICHAEL ABRAMS**

By: _____

Name: _____

Dated: _____

**SHKH LLC**

By: *Stephen Hochschuler*
DocuSigned by:
—724508B0B58747D—

Name: Stephen Hochschuler _____

Dated: 5/24/2018 7:30:22 AM MST _____

**MARK WANKEL**

By: _____

Name: _____

Dated: _____

**DIP LENDER**

**RICHARD PROPPER**                          **THOMAS S. BRIDGES REVOCABLE TRUST**

By: _____             By: _____

Name: Richard Propper                        Name: _____

Dated: 5/24/2018 7:37:32 AM MST         Dated: _____

**REID SCOTT HOLBROOK**                  **DR. MICHAEL ABRAMS**

By: _____             By: _____

Name: _____        Name: _____

Dated: _____        Dated: _____

**SHKH LLC**                                     **MARK WANKEL**

By: _____             By: _____

Name: _____        Name: _____

Dated: _____        Dated: _____

7

## DEBTORS/BORROWERS

**FREELINC TECHNOLOGIES, INC.**

By: Michael S. Abrams
DocuSigned by:
0CA829325B4445D...

Name: Michael S. Abrams

Dated: 5/24/2018 6:49:40 AM PDT

**FREELINC TECHNOLOGIES, LLC**

By: Michael S. Abrams
DocuSigned by:
0CA829325B4445D...

Name: Michael S. Abrams

Dated: 5/24/2018 6:49:40 AM PDT

**EXHIBIT 3**

FREELINC TECHNOLOGIES INC CASH PROJECTION
April 23, 2018 - July 22, 2018

| | Week 1 5/28/2018 | Week 2 6/4/2018 | Week 3 6/11/2018 | Week 4 6/18/2018 | Week 5 6/25/2018 | Week 6 7/2/2018 | Week 7 7/9/2018 | Week 8 7/16/2018 | Week 9 7/23/2018 | Week 10 7/30/2018 | Week 11 8/6/2018 | Week 12 8/13/2018 | Week 13 8/20/2018 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEGINNING CASH BALANCE | 8,893 | (43,337) | (221,337) | (239,292) | (278,772) | (312,839) | (363,673) | (378,943) | (418,423) | (430,768) | (493,800) | (478,871) | (526,351) | |
| REVENUE | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 24,999 | 1,000 | 1,000 | 36,999 |
| EXPENSES | 53,230 | 179,000 | 18,955 | 40,480 | 35,067 | 51,834 | 16,270 | 40,480 | 13,345 | 64,032 | 10,070 | 48,480 | 11,300 | 582,543 |
| NET EXPENSES | (43,337) | (221,337) | (239,292) | (278,772) | (312,839) | (363,673) | (378,943) | (418,423) | (430,768) | (493,800) | (478,871) | (526,351) | (536,651) | (545,544) |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | |
| Payroll, Healthcare, Rent | 25,900 | | 4,500 | 28,750 | 1,950 | 30,444 | 6,200 | 28,750 | 1,950 | 31,682 | | 36,750 | | 196,876 |
| Operating | 3,275 | 166,540 | 455 | 1,230 | 7,001 | 5,390 | 70 | 1,230 | 1,300 | 5,390 | 70 | 1,230 | 1,300 | 194,481 |
| Accounting | 2,460 | 2,460 | | | 2,460 | 6,000 | | | | | 2,460 | | | 15,840 |
| Licenses, Fees | 4,095 | | 4,000 | | 6,156 | | | | 95 | 7,000 | | | | 21,346 |
| TOTAL OPERATING EXPENSES | 35,730 | 169,000 | 8,955 | 29,980 | 17,567 | 41,834 | 6,270 | 29,980 | 3,345 | 46,532 | 70 | 37,980 | 1,300 | 428,543 |
| **SCHEDULE OF OTHER EXPENSES** | | | | | | | | | | | | | | |
| Thorpe North & Western, LLP (Patent) | 7,500 | - | - | - | 7,500 | - | - | - | - | 7,500 | | | | 22,500 |
| Debtor's Counsel - Dragich Law Firm | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 78,000 |
| Debtor's Counsel - Ashby & Geddes | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 39,000 |
| DIP Expenses | | | | 500 | | | | | 500 | | | 500 | | 1,500 |
| Claims/Noticing Agent | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 13,000 |
| UST Fees | | | | | | | | | | | | | | - |
| TOTAL OTHER EXPENSES | 17,500 | 10,000 | 10,000 | 10,500 | 17,500 | 10,000 | 10,000 | 10,500 | 10,000 | 17,500 | 10,000 | 10,500 | 10,000 | 154,000 |
| TOTAL EXPENSES | 53,230 | 179,000 | 18,955 | 40,480 | 35,067 | 51,834 | 16,270 | 40,480 | 13,345 | 64,032 | 10,070 | 48,480 | 11,300 | 582,543 |